IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| | ) | No. 30597-0-III |
| Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| MANUEL RAMIREZ, | ) | UNPUBLISHED OPINION |
| | ) | |
| Appellant. | ) | |

SIDDOWAY, J. — Manuel Ramirez appeals his conviction for third degree assault of a police officer, complaining that the jury was improperly instructed as the result of error by the court and ineffective assistance by his lawyer. We find no error and affirm.

FACTS AND PROCEDURAL BACKGROUND

At approximately 10 p.m. on an evening in August 2011, Manuel Ramirez was stopped by Maria Aceves, a security officer, as he attempted to enter the bar area of the Andaluz Night Club in Quincy. Ms. Aceves, the lead security officer at the club that evening, could see that Mr. Ramirez was wobbling and holding onto the wall in order to stand up; she could smell alcohol on his breath and concluded that he was drunk. Within about a 10-minute period, she warned him repeatedly—more than four times—that he could not come into the bar. She was armed with oleoresin (of capsicum)—pepper

spray—and ultimately warned him that if he continued his attempts to enter the bar she would spray him. He approached the bar again and she sprayed him in the face.

Mr. Ramirez fell to the floor and began crying. Ms. Aceves attempted to handcuff him, in order to eject him from the club. She was able to handcuff his right wrist, but he lay on his left arm and resisted Ms. Aceves's efforts to free it. He also banged his forehead and the side of his head on the ground during this time frame, eventually causing injury and bleeding to his face. As this was unfolding, Ms. Aceves was speaking to Mr. Ramirez in both Spanish and English. He responded in both languages, although his English was broken.

Ms. Aceves summoned two of her fellow security guards for assistance, but Mr. Ramirez held his left arm tightly under his body and they, too, were unable to free it. Eventually, Ms. Aceves called the Quincy police.

Officer Joseph Westby was the first officer to arrive. He was in uniform, identified himself to Mr. Ramirez, and asked for Mr. Ramirez's hand. When Mr. Ramirez did not cooperate, the officer reached for his forearm but Mr. Ramirez pulled it more tightly beneath him. Officer Westby repeated to Mr. Ramirez three times that he was a police officer and told him not to resist, but Mr. Ramirez would not budge. Officer Westby then attempted to secure compliance by using a "pain compliance" technique, pressing down on a three-nerve juncture below the jaw line on Mr. Ramirez's neck, followed by attempting to pull Mr. Ramirez's arm out from beneath him. Report of

Proceedings (Feb. 2, 2012) (RP) at 47-48. It appeared this might succeed but when the officer got close to freeing the hand from underneath Mr. Ramirez's body, Mr. Ramirez shifted, lifted his head, and bit Officer Westby on his right inner thigh. The officer struck Mr. Ramirez three times on his lower back in order to get him to stop biting.

Two other Quincy police officers had arrived and the three officers, individually or collectively, continued applying pain compliance techniques (a "gooseneck" wrist hold, an ankle twist, striking his ribs and arm with a police baton, and kneeling on the back of Mr. Ramirez's hamstrings) in unsuccessful efforts to secure his compliance. RP at 71.

Finally, the officers used a stun gun on Mr. Ramirez. On its third administration, with the stun gun placed directly on his back, Mr. Ramirez produced his left arm. Officer Westby immediately handcuffed him.

By the time of arrest, Mr. Ramirez's face was covered in blood and the paramedics had been called, so he was taken to the hospital. Officer Westby had the wound from Mr. Ramirez's bite examined and cleaned at the same time.

Mr. Ramirez was charged with third degree assault of a police officer.

At trial, Mr. Ramirez testified, through an interpreter, that on arriving at the Andaluz he paid the cover charge to someone who then disappeared, resulting in a misunderstanding as to whether he had paid. He accused Ms. Aceves of spraying him with pepper spray without warning based on the false accusation that he had not paid.

3

The pain from the pepper spray caused him to drop to the ground. There, someone grabbed his right arm and began to handcuff him; he testified he attempted to reach his collar with his left hand, hoping to use it to wipe the pepper spray from his face. He claimed that at some point someone kicked him in the mouth; he tried to open his eyes to see what was happening, but could only see his feet. He admitted that there came a point when others arrived and he heard them use the word "police" in English, which he understood, but he did not believe they were police officers. RP at 145.

Mr. Ramirez attributed his biting of Officer Westby to his need to end the extreme pain he claimed he was suffering. In direct examination, he testified that he "decided to bite without even thinking," but when cross-examined, he testified that the bite was a reaction "to stop this—to stop this assault. It was just a reaction, the only thing I could think to do" and stated "I just—that was the decision I made at that time with the—being desperate and being in anguish. Have you never been in anguish?" RP at 146-47, 157. He denied ever banging his head on the floor or smashing his cheek or nose on the floor.

After the close of the evidence, defense counsel proposed a self-defense instruction, relying on the officers' testimony as to the many "pain compliance" techniques that they applied and Mr. Ramirez's testimony that he was in anguish. Because this was an assault against a police officer, the proposed instruction was specific to an individual's limited right to resist detention by an officer and stated, in part:

4

A person may use force to resist an arrest only if the person being arrested is in actual and imminent danger of serious injury from an officer's use of excessive force. The person may employ such force and means as a reasonably prudent person would use under the same or similar circumstances.

Clerk's Papers (CP) at 18 (based upon 11 WASHINGTON PRACTICE: WASHINGTON

PATTERN JURY INSTRUCTIONS: CRIMINAL 17.02.01 (3d ed. 2008) (WPIC)).

The trial court heard extensive argument about the propriety of the instruction but

ultimately concluded that the evidence did not support giving it, explaining:

The State is correct that the evidence must show an actual danger of serious injury, not a potential for injury. . . .
The essence of the techniques that have been portrayed up to the time of the bite are techniques that are designed and intended to do precisely the opposite, create pain without physical injury. That would include everything that I can identify that was done prior to the bite. That includes a knee across the backs of the thighs, it includes twisting an ankle, it includes a gooseneck hold, it includes pulling on the arm. None of those things are accompanied with evidence that any of them created an actual danger of serious injury.
. . . [T]he legislature has—and the courts have seen fit to throw this area of protection around law enforcement officers that we're not going to let somebody say "Ouch, that hurts and, therefore, I'm going to whack you." And really that's what the evidence is in this case, that Mr. Ramirez was experiencing pain and he lashed out because he was experiencing pain.
The law simply doesn't countenance it but requires that—not just that he experience pain but that he be in actual danger of serious injury.

RP at 187-88.

Mr. Ramirez never requested a voluntary intoxication discussion and raised no

other objection to the court's instructions.

The jury found Mr. Ramirez guilty. He appeals.

5

ANALYSIS

Mr. Ramirez raises three issues on appeal: (1) the court erred in failing to instruct the jury on the meaning of "intent," (2) his lawyer provided ineffective assistance of counsel in failing to request an instruction defining "intent," and (3) his lawyer provided ineffective assistance in failing to request a voluntary intoxication discussion. We address the issues in turn.

I

Under RCW 9A.36.031(1), "[a] person is guilty of assault in the third degree if he or she, under circumstances not amounting to assault in the first or second degree: . . . (g) [a]ssaults a law enforcement officer . . . who was performing his or her official duties at the time of the assault." Intent is a nonstatutory element of assault, and the jury was instructed that "[a]n 'assault' is an *intentional* touching or striking of another person that is harmful or offensive, regardless of whether any physical injury is done to the person." CP at 24 (Instruction 4) (emphasis added); *State v. Finley*, 97 Wn. App. 129, 135, 982 P.2d 681 (1999).

The Washington Pattern Jury Instructions include a definition of "intent" and "intentionally." WPIC 10.01. The instruction must be given if requested and if intent is an element of the crime charged. *Id.* at 203 cmt. (citing *State v. Allen*, 101 Wn.2d 355, 678 P.2d 798 (1984)). Tracking the statutory definition of intent, the instruction states:

A person acts with intent or intentionally when acting with the objective or purpose to accomplish a result that constitutes a crime.

*Id.*; RCW 9A.08.010(1)(a). Mr. Ramirez did not ask the trial court to instruct the jury on the definition of "intent" but now says it was error for the trial court to fail to provide the instruction.

RAP 2.5(a) states the general rule for appellate disposition of issues not raised in the trial court: appellate courts will not entertain them. *State v. Guzman Nuñez*, 160 Wn. App. 150, 157, 248 P.3d 103 (2011) (citing *State v. Scott*, 110 Wn.2d 682, 685, 757 P.2d 492 (1988)), *aff'd*, 174 Wn.2d 707, 285 P.3d 21 (2012). Mr. Ramirez argues that this claimed error may be raised for the first time on appeal under an exception to the general rule provided by RAP 2.5(a)(3), which permits a party to raise initially on appeal a claim of "manifest error affecting a constitutional right."

To demonstrate "manifest error affecting a constitutional right," an appellant must demonstrate (1) the error is truly of constitutional dimension and (2) the error is manifest. *State v. O'Hara*, 167 Wn.2d 91, 98, 217 P.3d 756 (2009). Specifically, "the appellant must 'identify a constitutional error and show how the alleged error actually affected the [appellant]'s rights at trial.'" *Id.* (alteration in original) (quoting *State v. Kirkman*, 159 Wn.2d 918, 926-27, 155 P.3d 125 (2007)). If we find that the court committed a manifest constitutional error, it may still be subject to a harmless error analysis. *Kirkman*, 159 Wn.2d at 927.

7

Appellate courts do not assume that an alleged error is of constitutional magnitude. *Scott*, 110 Wn.2d at 687. Instead, we look to the asserted claim and assess whether, if correct, it implicates a constitutional interest as compared to another form of trial error. *See id.* at 689-91; *O'Hara*, 167 Wn.2d at 98.

Mr. Ramirez's assertion of manifest error affecting a constitutional right fails at this first step: the trial court's failure to instruct on the definition does not implicate a constitutional interest. The failure to instruct the jury on every *element* of the charged crime amounts to constitutional error. *State v. Gordon*, 172 Wn.2d 671, 677, 260 P.3d 884 (2011); *O'Hara*, 167 Wn.2d at 105 ("Due process requires a criminal defendant be convicted only when every element of the charged crime is proved beyond a reasonable doubt."). If the instruction properly informs the jury of the required elements, however, any failure to further define terms used in the elements is not an error of constitutional magnitude. *Gordon*, 172 Wn.2d at 677 (quoting *State v. Stearns*, 119 Wn.2d 247, 250, 830 P.2d 355 (1992)); *O'Hara*, 167 Wn.2d at 105 (quoting *State v. Fowler*, 114 Wn.2d 59, 69-70, 785 P.2d 808 (1990), *overruled on other grounds by State v. Blair*, 117 Wn.2d 479, 816 P.2d 718 (1991)).

In *Scott*, the court was asked whether the trial court's failure to define "knowledge" for the jury was constitutional error. 110 Wn.2d at 683-84. The court acknowledged that *State v. Tyler*, 47 Wn. App. 648, 736 P.2d 1090 (1987), *overruled by State v. Delcambre*, 116 Wn.2d 444, 805 P.2d 233 (1991), interpreted its decision in

8

*Allen* as having held that there is a constitutional requirement that a court define mental states. *Id.* at 684. It clarified *Allen* as dealing only with the technical term rule: that a party is entitled to have a technical term defined upon request. "*Allen* does not support [the] contention that the failure to define a technical term in an instruction is constitutional error that may be raised for the first time on appeal." *Id.* at 690; *see also O'Hara*, 167 Wn.2d at 106-07 (holding that the trial court's failure to define "malice" did not constitute error of a constitutional magnitude).

The same reasoning by which the court has determined that a failure to define "knowledge" and "malice" is not constitutional error applies here. Absent constitutional error, we need not analyze whether any error was manifest or harmless. RAP 2.5(a) applies.

## II

Mr. Ramirez next argues that he received ineffective assistance because his lawyer failed to request instructions for voluntary intoxication and a definition of "intent." We first address his lawyer's failure to request an instruction defining "intent."

To establish a claim for ineffective assistance of counsel, a defendant must prove that counsel's performance was deficient and that the deficient performance prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984); *State v. Nichols*, 161 Wn.2d 1, 8, 162 P.3d 1122 (2007). Deficient performance is that which falls "below an objective standard of reasonableness based on

consideration of all the circumstances." *McFarland*, 127 Wn.2d at 334-35. Prejudice is shown by demonstrating "a reasonable probability that, but for counsel's unprofessional errors, the outcome of the proceeding would have been different." *Nichols*, 161 Wn.2d at 8. If a party fails to satisfy one element, a reviewing court need not consider both. *State v. Foster*, 140 Wn. App. 266, 273, 166 P.3d 726 (2007).

In evaluating claims for ineffectiveness, courts are highly deferential to counsel's decisions and there is a strong presumption that counsel performed adequately. *Strickland*, 466 U.S. at 689-91. The defendant must show in the record the absence of a legitimate strategy or tactical reason supporting the lawyer's challenged conduct. *State v. Mannering*, 150 Wn.2d 277, 286, 75 P.3d 961 (2003).

It is not enough for Mr. Ramirez to show that he was entitled to an instruction defining "intent" if requested; to establish ineffective assistance, he must show in the record that his lawyer had no legitimate tactical reason for forgoing the instruction. He has not shown why his lawyer should have concluded that the technical definition would be helpful in his case. Recall that in *Allen*, which established a defendant's right to an instruction defining "intent" if requested, four of the justices would have held otherwise. 101 Wn.2d at 362-64 (Dolliver, J., dissenting). They were in the minority, of course, and *Allen* made the right to the instruction, if requested, clear. But the decision illustrates that reasonable legal minds can conclude that providing a statutory definition of "intent"

might add nothing in a particular case. Indeed, depending on the case, a reasonable lawyer might prefer for jurors to rely on a lay understanding of "intent."

Similarly, Mr. Ramirez has made no attempt to demonstrate how his lawyer's election not to request instruction on the statutory definition prejudiced him. His first claim of ineffective assistance fails on the basis of both elements.

## III

Finally, Mr. Ramirez argues that he received ineffective assistance because his lawyer failed to request a jury instruction on the relevance, to guilt, of voluntary intoxication.

RCW 9A.16.090 provides that

> [n]o act committed by a person while in a state of voluntary intoxication shall be deemed less criminal by reason of his or her condition, but whenever the actual existence of any particular mental state is a necessary element to constitute a particular species or degree of crime, the fact of his or her intoxication may be taken into consideration in determining such mental state.

*See also* WPIC 18.10, *cited with approval in State v. Coates*, 107 Wn.2d 882, 892, 735 P.2d 64 (1987). To obtain a jury instruction on voluntary intoxication, there must be some credible evidence that the defendant's drinking affected his ability to form the necessary mental state to commit the charged crime. *State v. Tilton*, 149 Wn.2d 775, 784, 72 P.3d 735 (2003); *State v. Gabryschak*, 83 Wn. App. 249, 252-53, 921 P.2d 549 (1996). Specifically, a defendant must show (1) the charged crime has a specific mental state,

11

(2) there is substantial evidence the defendant was drinking, and (3) evidence that the defendant's drinking affected his or her ability to form the required mental state. *Gabryschak*, 83 Wn. App. at 252; *State v. Everybodytalksabout*, 145 Wn.2d 456, 479, 39 P.3d 294 (2002). Evidence of drinking alone is insufficient; there must be substantial evidence of the alcohol's effects on the defendant's mind or body. *Gabryschak*, 83 Wn. App. at 253.

Third degree assault requires proof of an intentional act and there was sufficient evidence that Mr. Ramirez had been drinking—and drinking enough to affect his ability to form the required intent. *See, e.g., State v. Walters*, 162 Wn. App. 74, 83, 255 P.3d 835 (2011) (evidence of defendant's slurred speech, unsteady gait, droopy and bloodshot eyes, nonresponse to pain compliance techniques short of a stun gun sufficient to support voluntary intoxication instruction); *State v. Kruger*, 116 Wn. App. 685, 692, 67 P.3d 1147 (2003) (evidence of defendant's blackout, vomiting, slurred speech, and imperviousness to pepper spray supported instruction). The problem with this argument on appeal, though, is that the evidence suggesting that Mr. Ramirez was intoxicated to the point of impairment—evidence that he was wobbling, holding onto walls, and failing to respond to the officers' actions and pain compliance techniques—generally came from others and was inconsistent with Mr. Ramirez's own testimony and the defense that he chose to present.

12

Mr. Ramirez's own testimony was that he bit Officer Westby intentionally, in self-defense. He testified that he heard the officers identify themselves as police, even if he did not believe it. On cross-examination, he claimed to have consumed only four, regular-sized bottles of beer before arriving at the Andaluz. RP at 153.

The trial court might reasonably have concluded from Mr. Ramirez's testimony that he was not entitled to the instruction because his ability to form the required intent was not affected. A voluntary intoxication instruction was denied in *State v. Harris*, 122 Wn. App. 547, 552-53, 90 P.3d 1133 (2004), for example, because the defendant testified, notwithstanding proof that he had used crack cocaine, that he shot his victim in self-defense.

Equally important, Mr. Ramirez's testimony illustrates why Mr. Ramirez's lawyer would not request an involuntary intoxication instruction: he wanted to argue self-defense, which depended upon the jury believing that Mr. Ramirez was resisting arrest with the force and means that a reasonably prudent person would use under the same or similar circumstances.

It is reasonable for a lawyer to rely only on defenses that are consistent. *See Mannering*, 150 Wn.2d at 287 (counsel was not ineffective for refraining from raising a defense that would be inconsistent with her principal defense). The fact that the trial court ultimately refused to instruct the jury on self-defense does not demonstrate deficient performance; the trial court carefully considered whether it should give the instruction

13

before ultimately deciding that the evidence did not support it. *See State v. Grier*, 171 Wn.2d 17, 43, 246 P.3d 1260 (2011) (stating that whether a "strategy ultimately proved unsuccessful is immaterial" and that "hindsight has no place in an ineffective assistance analysis" when discussing the deficient performance prong of an ineffective assistance of counsel claim). Notably, had the trial court given the self-defense instruction, it is the State that would have borne the burden of proving beyond a reasonable doubt that Mr. Ramirez's use of force was not lawful. WPIC 17.02.01, at 257.

Mr. Ramirez fails to demonstrate that his lawyer's performance was deficient.

The judgment and sentence are affirmed.

A majority of the panel has determined that this opinion will not be printed in the Washington Appellate Reports but it will be filed for public record pursuant to RCW 2.06.040.

_____
Siddoway, J.

WE CONCUR:

_____
Korsmo, C.J.

_____
Brown, J.

14